THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Respondent, *v.* THOMAS BRENNAN, Appellant.

1. BUILDING RESTRICTION — ENFORCEMENT. An action to enforce an alleged negative easement, such as a building restriction, by an owner of neighboring property against property derived from a common grantor, cannot be maintained when the covenant relied on is exclusively for the benefit of the grantor, and there is no mutual agreement or undertaking between the various owners creating an easement, and nothing in the surrounding circumstances from which mutual rights can be fairly inferred.

2. BUILDING RESTRICTION — FAILURE OF PROOF. The owner of two cross-street lots in the eastern or Park avenue half of a block in New York city, the western or Madison avenue half of which was covered by building restrictions, brought an action in equity to enforce an alleged restriction against the building of stables on lots fronting on Park avenue, derived from a common grantor through a deed which, as well as the deeds under which the plaintiff and another cross-street owner held title to their respective lots, contained a covenant by the grantee to the grantor, his heirs and assigns, not to build a stable or certain other specified buildings on the premises, and stated that the covenants therein on the part of the grantee should run with the land and bind all successive owners thereof, and their heirs and assigns. None of the deeds referred to any uniform plan of restriction or contained any mutual covenant binding on the grantor. *Held*, that the covenant, running to the grantor only, did not, standing by itself, tend in any way to prove the plaintiff's case; that

the surrounding circumstances failed to establish any uniform plan of restriction on the eastern half of the block; and, hence, that a judgment in favor of the plaintiff should be reversed.

*Eq. L. Ass. Socy.* v. *Brennan* (74 Hun, 576), reversed.

(Argued February 20, 1896; decided March 10, 1896.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made December 15, 1893, which affirmed a judgment in favor of plaintiff entered upon the report of a referee.

This action was brought to restrain the defendant from using certain buildings erected upon his lands as stables in violation of an alleged covenant prohibiting such use. The judgment enjoined and restrained the defendant from using the buildings in question erected upon his lands as stables, unless within sixty days after the entry of judgment he should pay to the plaintiff the sum of $10,000 upon the delivery to him of a release of his lands from a covenant contained in a deed from James Augustus Page to Abraham Benson, which, it was claimed, prohibited the use of defendant's lands for the purposes of a private stable.

The following is a diagram of the block in question in the action :

### Fifty-first Street.

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25.5 | 100<br>8 | 25 | 25 | 25 | 25A | 25 | 25 | 25 | 25 | 100<br>17 | 25.5 |
| 25 | 7 | | | | | | | | | 18 | 25 |
| 25 | 6 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 19 | 25 |
| 25 | 5 | | | | | | | | 100.5 | 20 | 25 |
| 25 | 4 | | | | | | | | 100.5 | 21 | 25 |
| 25 | 3 | 32 | 31 | 30 | 29 | 28 | 27 | 26 | 25 | 22 | 25 |
| 25 | 2 | | | | | | | | | 23 | 25 |
| 25.5 | 1 | 25 | 25 | 25 | 25B | 25 | 25 | 25 | 25 | 24 | 25.5 |

Madison Avenue. / (Fourth) Park Avenue.

### Fiftieth Street.

The facts, so far as material, are stated in the opinion.

*Louis Marshall* for appellant.    The referee having declined to find that the parol agreement between Page and Spaulding alleged in the complaint was entered into, the defendant was entitled to a dismissal of the complaint. (*Day* v. *Town of New Lots*, 107 N. Y. 148; *Romeyn* v. *Sickles*, 108 N. Y. 650.)   Even if the making of the parol agreement alleged in the complaint had been established and found by the referee, it would not have been valid or binding on the defendant. (*Crosdale* v. *Lanigan*, 129 N. Y. 604; *Cronkhite* v. *Cronkhite*, 94 N. Y. 323; *Wiseman* v. *Lucksinger*, 84 N. Y. 31.) The documentary evidence fails to establish an equitable negative easement in favor of the plaintiff's property in that of the defendant restricting the latter in the free enjoyment thereof for any lawful purpose. (*Post* v. *Weil*, 115 N. Y. 361; *Sandford* v. *Travers*, 40 N. Y. 140; *Booth* v. *C. R. M. Co.*, 74 N. Y. 15; *H. C. Co.* v. *P. C. Co.*, 8 Wall. 276; *Churchward* v. *Queen*, L. R. [1 Q. B.] 173; *Renals* v. *Cowlishaw*, L. R. [9 Ch. Div.] 125; *Keates* v. *Lyon*, L. R. [4 Ch. App.] 218.) Whatever may have been the effect of the several covenants in the respective conveyances executed by Page upon one having knowledge or notice of the facts, from which an equitable easement is sought to be inferred, the appellant, having had neither actual nor constructive notice of the facts on which such easement in the property owned by him is claimed to have been acquired by the respondent, took his property free from such easement. (*C. V. Bank* v. *Delano*, 48 N. Y. 326.) If the plaintiff is entitled to recover on the theory of a general plan of restriction, or on any other theory, the damages could only have been nominal, and the conclusion that the plaintiff has suffered $10,000 damage is contrary to the undisputed evidence and without warrant of law. (*Mowry* v. *Whitney*, 14 Wall. 620; *Black* v. *Thorne*, 111 U. S. 122; *Parsons* v. *Pettingill*, 11 Allen, 507; *Bohm* v. *M. E. R. Co.*, 129 N. Y. 576; *Newman* v. *M. E. R. Co.*, 118 N. Y. 618.)

*Lucius H. Beers* for respondent. The covenant against nuisances in the deed from Page to Benson was made for the benefit of the prior purchasers from Page of the adjoining lands, and created an equitable negative easement over the Benson lots in favor of those adjoining lands. (*Knapp* v. *Hall*, 20 N. Y. Supp. 42; *Barrow* v. *Richard*, 8 Paige, 351; *Brouwer* v. *Jones*, 23 Barb. 153; *Tallmadge* v. *E. R. Bank*, 26 N. Y. 105; *Gibert* v. *Peteler*, 38 N. Y. 168; 38 Barb. 513; *Trustees Columbia College* v. *Lynch*, 70 N. Y. 448; *P. Ins. Co.* v. *C. Ins. Co.*, 87 N. Y. 408; *Whitney* v. *U. R. R. Co.*, 11 Gray, 364; *Kilpatrick* v. *Peshine*, 24 N. J. Eq. 214; *Parker* v. *Nightengale*, 16 Allen, 341.) The doctrine declared in *Barrow* v. *Richard* and in *Brouwer* v. *Jones*, that a covenant against restrictions inures to the benefit of prior purchasers from the same grantor, does not depend upon any special language or upon the reference to neighboring inhabitants contained in the covenants then before the court. (*A. D. Co.* v. *Libby*, 45 N. Y. 499; *Countryman* v. *Deck*, 13 Abb. [N. C.] 110; Pom. Eq. Jur. [2d ed.] 1993, 1994; *Raynor* v. *Lyon*, 46 Hun, 227.) The allegations of the complaint fully support the decisions of the Special and General Terms, irrespective of any allegations or proofs as to the parol agreement between Page and Spaulding. (*Rogers* v. *N. Y. & T. L. Co.*, 134 N. Y. 197.) Mrs. Spaulding took title from Page on the faith of his parol agreement to restrict his remaining lots in the block by the same restrictive covenant as that contained in the deed to her. That agreement, in equity, attached to Page's remaining lots and inured to the benefit of Mrs. Spaulding and her grantees. (*Tallmadge* v. *E. R. Bank*, 26 N. Y. 105; *Banks* v. *A. T. Society*, 4 Sandf. Ch. 438; *Hills* v. *Miller*, 3 Paige Ch. 254; *Knapp* v. *Hall*, 20 N. Y. Supp. 43.) The defendant took title under circumstances which put him upon inquiry as to all rights of adjoining owners, and he is, therefore, in equity, charged with notice of the parol agreement. (*Birdsall* v. *Tiemann*, 12 How. Pr. 551; *Dunn* v. *Hornbeck*, 72 N. Y. 80; *Knapp* v. *Hall*, 20 N. Y. Supp. 42; *Tallmadge* v. *E. R. Bank*, 26 N. Y. 105.)

The attempted release by Mrs. Page was inoperative so far as the plaintiff's rights are concerned. (*Raynor* v. *Lyon*, 46 Hun, 227.)   The award of money damages in lieu of an injunction is within the powers of the court, and was warranted by the evidence. (*Amerman* v. *Deane*, 132 N. Y. 355; *Mott* v. *Oppenheimer*, 135 N. Y. 312; Sedg. on Dam. 60; *Steers* v. *City of Brooklyn*, 101 N. Y. 51; Code Civ. Pro. §§ 508, 538.)

BARTLETT, J.   The plot of land involved in this litigation was originally owned by the trustees of St. Patrick's Cathedral in the city of New York, and is bounded on the north by Fifty-first street, on the south by Fiftieth street, on the west by Madison avenue, and on the east by Park, formerly Fourth avenue.   The size of this block is 200 feet on the avenues and 400 feet on the streets.

On the 15th of April, 1881, the trustees sold to J. Augustus Page this block and he divided it into 32 different lots, each having a frontage of 25 feet and a depth of 100 feet.   At the request of Page the trustees conveyed to Henry Villard all·of the lands on the Madison avenue front, one lot on Fifty-first street and one lot on Fiftieth street, immediately in the rear of the Madison avenue lots.   The remainder of the block the trustees conveyed to Page.   In the contract between Page and the trustees it was provided that certain restrictions should be imposed upon the western half of the block, *i. e.*, the half nearest Madison avenue.   The deed from the trustees to Page contained the following covenant on the part of Page : " And the said party of the second part, for himself, his heirs, executors, administrators and assigns, doth hereby covenant, promise and agree, to and with the said parties of the first part, their successors and assigns, that neither he nor any of his heirs or assigns shall at any future time or times erect or build, or permit or cause to be erected or built, any stable, factory, machine shop, brewery, distillery, slaughter house, carpenter or smith's shop or structure or erection for the purpose of any kind of manufacturing or for any trade, business or employment which

84

shall be dangerous or noxious or constitute a nuisance upon either Ten, Eleven, Twelve, Twenty-nine, Thirty or Thirty-one above described or any part thereof.   And the said party of the second part, for himself, his heirs, executors, administrators and assigns, doth further covenant, promise and agree to and with the said parties of the first part, their successors or assigns, that no building or buildings, other than first-class stone or brick front dwelling houses or French apartment houses shall be erected upon either of the lots last above mentioned.   It being understood and agreed that the foregoing covenants on the part of the party of the second part shall run with the land and bind all successive owners and their heirs and assigns."

It was expressly provided that this covenant should affect only the westerly half of the property conveyed.   The deed executed by the trustees to Villard contained the same covenant.   The result was that, under these conveyances, Page owned the easterly half of the block, without restrictions of any kind.

On the 10th of January, 1882, Page conveyed to Robert and Ogden Goelet the two westerly lots of the easterly half of the block lying on Fifty-first street.   This deed contained the following covenant :

" The said parties of the second part, for themselves, their heirs, executors and administrators and assigns, do hereby covenant, promise and agree to and with the said parties of the first part, their heirs and assigns, that neither they nor any of their heirs or assigns, shall, at any future time or times, erect or build, or permit or cause to be erected or built, any stable, machine shop, brewery, distillery, slaughter house or smith's shop upon said premises, it being understood and agreed that the foregoing covenants on the part of the parties of the second part shall run with the land and bind all successive owners thereof, and their heirs and assigns."

This covenant differs essentially from that entered into by Page with the trustees of St. Patrick's Cathedral, as will be pointed out hereafter.

On January 10th, 1883, Page conveyed to Rosanna Spaulding the two westerly lots on the east half of the block lying on Fiftieth street, being premises immediately in the rear of the Goelet lots. This deed contained the same covenant as that inserted in the conveyance to the Goelets.

On March 1st, 1883, Page conveyed to one Abraham Benson the remaining lots in the easterly half of the block, which included those now owned by the defendant. This deed contained the same covenants as the deeds to the Goelets and Mrs. Spaulding. Benson paid no cash for the property conveyed to him, but executed mortgages for the full amount of the purchase money, and also agreed to execute further mortgages to secure advances which were to be made to him by Page to enable him to erect buildings upon the property.

On the 20th of September, 1883, Page died, and by his will he devised and bequeathed all his property, real and personal, to his wife, Mary E. Page.

On the 21st of February, 1884, Benson conveyed to Robert C. Hine all of the property deeded to him by Page, including the buildings in process of erection, subject to mortgages made to Page. On the 10th of March, 1884, Mary E. Page executed to Hine a release of the covenant against nuisances contained in Page's deed to Benson.

The defendant thereafter became the owner of that portion of the east half of the block lying on Park avenue and running westerly 100 feet on each street. There were nine mesne conveyances before the title vested in defendant, and in none of them was there a reference to any restrictive covenant. The plaintiff is now the owner of the lots conveyed to Mrs. Spaulding, on which stands an apartment house.

The main question presented by this appeal is whether the defendant rests under the restrictions contained in the deed from Page to Benson. The learned referee, in the 12th finding of fact, states: "Said Page adopted and acted upon a uniform plan of restriction in making conveyances of said easterly half of said block, but this finding is not based upon

any oral statements alleged to have been made by Mr. Page to Mr. John Lindley."

The complaint alleged an agreement between Mrs. Spaulding and Page, whereby the latter covenanted to restrict the eastern portion of the block in the same manner as by the covenant in her deed. The plaintiff attempted to prove this agreement by Mr. Lindley, the attorney for Mrs. Spaulding, but evidently failed to do so.

The General Term state that the 12th finding of fact was the only one challenged by the appellant, and they were of opinion that it was sustained by the weight of documentary evidence and by the testimony descriptive of the uses of the adjacent property at the time the deeds containing the restrictive clauses were executed. We are unable to agree with this conclusion, and are of opinion that the 12th finding of fact is wholly unsupported by evidence.

It is urged on the part of the defendant that the Goelet and Spaulding deeds are no part of his chain of title, that he had no notice of the same, and that there was nothing in the conveyances disclosed by any legitimate search he was required to make, that would put him on inquiry as to the restrictions imposed upon adjacent property.

It is also insisted that the only covenant brought to defendant's notice was that contained in the deed from Page to Benson, which had been released as disclosed by the record.

We do not deem it necessary to decide this point or to rest our decision upon this narrow ground.

Assuming that the Goelet, Spaulding, Benson deeds are a part of defendant's chain of title, we hold that neither the documentary evidence, nor the testimony relating to the uses of the adjacent property establishes a uniform plan of restriction as found by the court below. It will be observed that the covenant contained in the three deeds in question and relied upon as the documentary evidence to establish this uniform plan of restriction, is wholly silent as to any such plan and is for the benefit of the grantor only. In neither of the deeds is there a mutual covenant binding the grantor. So

far as the facts in this case disclose any plan in regard to restriction, we think it is confined to the westerly portion of this block. The difference in location between the Madison avenue and the Park avenue fronts of this property is suggestive as to the question in controversy. The western half of this block is located in one of the most valuable residential districts in the city of New York off of Fifth avenue. The conditions on the Park avenue front are wholly different. In Park avenue, between Fiftieth and Fifty-second streets, it appears by the findings that there is a deep cut forty-five feet wide, through which run the trains of the New York & New Haven, The Harlem and The New York Central & Hudson River Railroad Companies. Opposite the premises in question this cut is about six feet deep below the surface of the street. The Grand Central Depot is between Forty-second and Forty-fifth streets, and the trains and cars of these railroad companies are passing and repassing these premises at short intervals during the day and night. For the purpose of making up trains and taking out cars from the storage tracks, the switch engines while engaged in this business often run as far north as Fifty-third street. These trains and engines passing along the avenue make much noise and emit smoke, cinders and steam. There are about 460 movements per day along the tracks in front of the premises in question, and it is expressly found that the number of these movements has more than doubled within the last three years.

This condition of affairs renders it very clear why Page took from the trustees of St. Patrick's Cathedral the eastern half of this block wholly unrestricted. It also explains why Page when inserting the covenant of restriction in the Goelet deed modified it so materially from the covenant exacted by the trustees as to the western half of the block. The extent of this modification will be better appreciated by quoting that portion of the covenant applying to the western half of the block, which was omitted from the covenant in the Goelet deed. We give below the covenant in full, the italics showing the omitted portions:

" And the said party of the second part, for himself, his heirs, executors, administrators and assigns, doth hereby covenant, promise and agree to and with the said parties of the first part, their successors and assigns, that neither he nor any of his heirs or assigns shall at any future time or times, erect or build, or permit to cause to be erected or built, any stable, *factory*, machine shop, brewery, distillery, slaughter house, *carpenter or* smith shop, *or structure or erection, for the purpose of any kind of manufacturing, or for any trade, business or employment which shall be dangerous, noxious or constitute a nuisance upon either* 10, 11, 12, 29, 30 *or* 31 *above described, or any part thereof. And the said party of the second part, for himself, his heirs, executors, administrators and assigns, doth further covenant, promise and agree to and with the said parties of the first part, their successors or assigns, that no building or buildings other than first-class stone or brick-front dwelling houses or French apartment houses shall be erected on either of the lots last above mentioned.* It being understood and agreed that the foregoing covenants on the part of the party of the second part shall run with the land and bind all successive owners and their heirs and assigns."

Another important fact should be recalled in this connection, to wit, at the time Page conveyed to the Goelets he was still the owner of lots in the western half of the block, resting under the severe restrictions to which we have referred, and it is quite reasonable that he should require his grantees to enter into the modified covenant that was inserted in their deed, for the reason that the lots conveyed to them were the westerly ones of the eastern half of the block, and lying adjacent to the property resting under the more stringent covenant against nuisances. The covenant in the Spaulding deed was reasonable, the lots being also adjacent to the restricted property. That Page should have inserted the same modified covenant in his deed to Benson was quite natural, in view of the circumstances under which that conveyance was made. Benson had paid no portion of the purchase money in cash, and Page evi-

dently deemed it wise to retain some control of the property. In this connection it may be well to call attention to the testimony of John Lindley, who was sworn as a witness for the plaintiff. He, as the attorney for Mrs. Spaulding, attempted to explain why he had not inserted in the deed from Page to Mrs. Spaulding the covenant requiring Page to restrict the balance of the property in the block. The reason he gave was that it might interfere if they bought the balance of the block, as he did not wish to be embarrassed by restrictions. He further stated that they were under negotiations with Page to buy to Fourth avenue, and would have done so in all human probability had they been able to negotiate a loan on the rest of the block. It further appeared that this negotiation for a loan was with the plaintiff company, and that the representative of the latter reported against making it because of the "noise of the engines."

We have here not only very good reason given why there were no mutual covenants of restriction in the Spaulding deed, but a practical illustration of the effect of the railroads on the Park avenue side of this block.

We think enough has been stated in regard to the manner in which this block has been conveyed and restricted from time to time to show that no uniform plan of restriction was established by the transactions in relation to the eastern half of the block.

This brings us again to the documentary evidence, and we have already pointed out that upon the face of the three deeds relied upon there is nothing disclosed except a covenant binding the grantee, his heirs and assigns, for the benefit of the grantor.

While it may not be possible to harmonize all the authorities in this country and England on the subject of equitable negative easements, yet a few general rules may be regarded as settled by the cases. It is not necessary in order to sustain the action that there should be privity either of estate or of contract; nor is it essential that an action at law should be maintainable on the covenant; but there must be found some-

where the clear intent to establish the restriction for the benefit of the party suing or his grantor, of which right the defendant must have either actual or constructive notice.

If the covenant is silent; if there is no mutual agreement or understanding between the various owners creating an easement; if there is nothing in the surrounding circumstances from which mutual rights can be fairly inferred, then no action can be maintained. There is a class of cases where the covenant, by a fair interpretation of its language, is not exclusively for the benefit of the grantor, but of other property owners in the immediate vicinity. (*Barrow* v. *Richard,* 8 Paige, 351; *Brouwer* v. *Jones*, 23 Barb. 153; *Seymour* v. *McDonald,* 4 Sandf. Ch. 502; *Lattimer* v. *Livermore*, 72 N. Y. 174.)

There is still another line of cases where the covenant was for the benefit of specific owners of lots and reciprocal covenants were entered into. (*Trustees* v. *Lynch*, 70 N. Y. 440.) There are many cases in this country and England which uphold the doctrine laid down in *Tallmadge* v. *The East River Bank* (26 N. Y. 105) to the effect that although the legal title be absolute and unrestricted, yet the owner may, by parol contract with the purchasers of successive parcels in respect to the manner of its improvement and occupation affect the remaining parcels with an equity requiring them also to be occupied in conformity to the general plan which is binding upon a subsequent purchaser with notice.

In the case at bar the covenant running to the grantor only does not, standing by itself, tend in any way to prove the plaintiff's case, while the surrounding circumstances fail to establish any uniform plan of restriction on the eastern half of the block.

The judgment appealed from should be reversed and a new trial ordered, with costs to abide the event.

All concur, except Haight, J., not voting.

Judgment reversed.